UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KYLE THOMAS ROZEMA,

Plaintiff,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

Defendants.

Case No. 5:14-CV-495 (GTS/DEP)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

    A.    The Tobacco Act ............................................................................................ 3

    B.    Defendants' § 904(a)(1) Submissions .......................................................... 5

    C.    FDA 05-2010 Menthol Request And Defendants' Response ......................... 6

    D.    Section 904(e)'s Requirements Regarding Harmful And Potentially Harmful Constituents.............................................................................................. 7

    E.    Plaintiff's FOIA Request And Federal Suit ................................................... 7

II.    THE DOCUMENTS PLAINTIFF SEEKS REFLECTING THE QUANTITIES OF MENTHOL THAT DEFENDANTS USE IN MANUFACTURING THEIR PRODUCTS ARE EXEMPT FROM DISCLOSURE ............................................. 9

    A.    The Amounts Of Menthol That Defendants Use To Manufacture Their Cigarettes Constitute Trade Secrets ....................................................... 10

    B.    The Amounts Of Menthol Defendants Use To Manufacture Their Cigarettes Constitute Confidential Commercial Information ............................... 14

        1.    The Information Is "Commercial" ......................................................... 15

        2.    Each Defendant Is A "Person" .............................................................. 15

        3.    The Information Is "Confidential" ......................................................... 15

III.    DOCUMENTS THAT PLAINTIFF SEEKS REGARDING THE AMOUNTS OF MENTHOL IN PM USA'S MANUFACTURED PRODUCTS ARE EXEMPT FROM DISCLOSURE ............................................................................................ 19

    A.    The Information Constitutes Confidential Commercial Information ............ 19

    B.    Information that PM USA Voluntarily Provided Is Categorically Protected ....... 20

IV.    PLAINTIFF'S RELIANCE ON § 904(e) IS MISPLACED ............................. 23

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acumenics Research & Tech. v. U.S. Dep't of Justice*,
843 F.2d 800 (4th Cir. 1988) ...............................................................................................10

*Africa Fund v. Mosbacher*,
No. 92 Civ. 289 (JFK), 1993 WL 183736 (S.D.N.Y. May 26, 1993) ....................................21

*Am. Airlines, Inc. v. Nat'l Mediation Bd.*,
588 F.2d 863 (2d Cir. 1978)............................................................................................15, 19

*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*,
950 F. Supp. 2d 221 (D.D.C. 2013) .......................................................................................9

*Appleton v. F.D.A.*,
451 F. Supp. 2d 129 (D.D.C. 2006) ...................................................................................2, 14

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
601 F.3d 143 (2d Cir. 2010).................................................................................................15

*Carney v. U.S. Dep't of Justice*,
19 F.3d 807 (2d Cir. 1994)..................................................................................................8, 9

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)...........................................................................................................3, 23

*Citizens Comm'n on Human Rights v. FDA*,
1993 WL 1610471 (C.D. Cal. May 10, 1993), *aff'd in part & remanded in part on
other grounds*, 45 F.3d 1325 (9th Cir.1995)..........................................................................14

*Critical Mass Energy Project v. NRC*,
975 F.2d 871 (D.C. Cir. 1992) ................................................................................... passim

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
244 F.3d 144 (D.C. Cir. 2001)..........................................................................................10, 21

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
93 F. Supp. 2d 1 (D.D.C. 2000)........................................................................................18, 19

*FCC v. AT&T Inc.*,
131 S. Ct. 1177 (2011)..........................................................................................................15

*Fox News Network, LLC v. U.S. Dep't of Treasury*,
911 F. Supp. 2d 261 (S.D.N.Y. 2012)...................................................................................9

*Gen. Elec. Co. v. Dep't of Air Force*,
648 F. Supp. 2d 95 (D.D.C. 2009) ......................................................................................10

*Greenberg v. FDA*,
803 F.2d 1213 (D.C. Cir. 1986) .......................................................................................2, 20

*Herrick v. Garvey*,
298 F. 3d 1184 (10th Cir. 2002) .......................................................................................2, 14

*Lawyers Comm. for Human Rights v. INS*,
721 F. Supp. 552 (S.D.N.Y. 1989) .......................................................................................8

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)...............................................................................................24

*Nadler v. FDIC*,
92 F.3d 93 (2d Cir. 1996)..........................................................................................2, 15, 16

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*,
811 F. Supp. 2d 713 (S.D.N.Y. 2011).....................................................................................9

*New York Public Interest Research Group v. E.P.A.*,
249 F. Supp. 2d 327 (S.D.N.Y. 2003)....................................................................................22

*Pentagen Techns., Inc. v. United States*,
No. 98 Civ. 4831 (AGS) (THK), 2000 WL 347165 (S.D.N.Y. Mar. 31, 2000)...................3, 21

*Pub. Citizen Health Research Grp. v. FDA*,
704 F.2d 1280 (D.C. Cir. 1983) ................................................................................ passim

*Williams v. Curtiss-Wright Corp.*,
681 F.2d 161 (3d Cir. 1982).........................................................................................2, 14, 20

*Wilner v. Nat'l Sec. Agency*,
592 F.3d 60 (2d Cir. 2009)......................................................................................................9

*Worthington Compressors, Inc. v. Costle*,
662 F.2d 45 (D.C. Cir. 1981) .........................................................................................2, 20


STATUTES

5 U.S.C. § 551(2) ....................................................................................................................15

5 U.S.C. § 552(a)(4)(B) ..........................................................................................................23

5 U.S.C. § 552(b)(4) ............................................................................................... passim

The Family Smoking Prevention and Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009) ................................................................................................................4, 5, 7, 23

Trade Secrets Act, 18 U.S.C. § 1905 ....................................................................................10

## OTHER AUTHORITIES

21 C.F.R. § 20.61(a)................................................................................................................10

76 Fed. Reg. 50226 (Aug. 12, 2011)........................................................................................7

77 Fed. Reg. 20034, 20036-37 (Apr. 3, 2012) ...............................................................3, 7, 23

**INTRODUCTION**

Defendant-Intervenors Philip Morris USA Inc. ("PM USA"), R.J. Reynolds Tobacco Company ("RJRT"), and Santa Fe Natural Tobacco Company, Inc. ("SFNTC") (hereinafter referred to collectively as "Defendants") respectfully submit this memorandum in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b).[1]

Plaintiff brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, seeking to compel the Department of Health and Human Services ("HHS") and the Food and Drug Administration ("FDA") to release confidential and trade secret documents showing the "quantities of menthol" in Defendants' cigarettes listed "by quantity in each brand and subbrand from 2000 to 2010." Compl. ¶ 6 (Doc. 1). Giving a broad reading to Plaintiff's FOIA request, the documents that Plaintiff seeks fall into two general categories: (1) documents disclosing the quantities of menthol that Defendants use in manufacturing their products -- including documents reflecting recipe and formula information for Defendants' products that Defendants were required to provide to FDA under § 904(a) the Family Smoking Prevention and Control Act ("Act" or "Tobacco Act"); and (2) documents disclosing the quantities of menthol in PM USA's finished products -- including documents reflecting such information that Defendants voluntarily provided to FDA pursuant to an agency request. Both of these categories of documents are exempt from disclosure under FOIA.

*First*, documents that disclose the quantities of menthol that Defendants use in their manufacturing processes are exempt because such information constitutes trade secrets and confidential commercial information under FOIA Exemption 4. 5 U.S.C. § 552(b)(4). Because

---

[1] Section II of this memorandum applies only to Defendant PM USA. All three Defendants -- PM USA, RJRT, and SFNTC -- join in the other two sections of this motion and memorandum.

1

menthol is the defining ingredient of Defendants' menthol cigarettes, the quantities of menthol that Defendants use to make their different menthol brands are more than just commercially valuable; they are *essential* to each brand's proprietary recipe. Defendants go to great lengths to safeguard the secrecy of that information. Federal courts across the country have recognized that documents submitted to FDA revealing a product's manufacturing specifications meet the definition of "trade secret" under FOIA and are therefore exempt from disclosure. *See Herrick v. Garvey*, 298 F. 3d 1184 (10th Cir. 2002); *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161 (3d Cir. 1982); *Appleton v. F.D.A.*, 451 F. Supp. 2d 129 (D.D.C. 2006). The same is true here. And even if this information did not constitute trade secrets, it would still be protected from disclosure as confidential commercial information because Defendants keep it secret and revealing it would cause substantial harm to Defendants' competitive position. *See Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996).

*Second*, documents that disclose the quantities of menthol in PM USA's manufactured products constitute exempt confidential commercial information because disclosing those documents to competitors would cause substantial harm to PM USA's competitive position. *Nadler*, 92 F.3d at 95. It makes no difference that some of the information could be obtained by purchasing and testing PM USA's products because such testing is prohibitively expensive and the results would not be a substitute for the precise information provided to the FDA. *See*, *e.g.*, *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981); *Greenberg v. FDA*, 803 F.2d 1213, 1218 (D.C. Cir. 1986); *Williams*, 681 F.2d at 163-64. Indeed, some of the information that Plaintiff seeks is of a historical nature that could be difficult or nearly impossible to recreate through current testing, without the original product available. Further, this information is wholly exempt from disclosure under *Critical Mass Energy Project v. NRC*,

975 F.2d 871 (D.C. Cir. 1992), because PM USA voluntarily provided the information to the government (as confidential) and does not customarily disclose the information to the public. District Courts in the Second Circuit have applied this test from *Critical Mass* in analyzing whether voluntarily produced information should be subject to disclosure under FOIA, as should this Court here. *See*, *e.g.*, *Pentagen Techns., Inc. v. United States*, No. 98 Civ. 4831 (AGS) (THK), 2000 WL 347165, at \*2 (S.D.N.Y. Mar. 31, 2000).

*Finally*, Plaintiff's likely argument that the FDA should have published the information that he seeks under § 904(e) of the Act because menthol is a "harmful or potentially harmful constituent" ("HPHC") in tobacco products is both factually wrong and a legal red herring. Pursuant to the Tobacco Act, the FDA has established a list of 93 HPHCs; but, contrary to Plaintiff's assertions, menthol is *not* now, nor has it ever been, on that list. *See* Harmful and Potentially Harmful Constituents in Tobacco Products and Tobacco Smoke; Established List, 77 Fed. Reg. 20034, 20036-37 (Apr. 3, 2012). While Plaintiff may disagree with the FDA's decision not to list menthol as an HPHC, that disagreement is irrelevant to this case. FOIA is exclusively a document disclosure statute -- not a vehicle through which Plaintiff can challenge the FDA's determination regarding HPHCs. *Chrysler Corp. v. Brown*, 441 U.S. 281, 292 (1979) (holding that FOIA is "exclusively" a disclosure statute).

Accordingly, this Court should grant summary judgment in Defendants' favor.

**STATEMENT OF FACTS**

**A.      The Tobacco Act**

On June 22, 2009, Congress enacted the Tobacco Act, giving FDA broad new statutory authority to regulate tobacco products, including the manufacture and marketing of cigarettes.

*See* Statement of Material Facts ("SMF") ¶ 1.[2]  The Act directed the Secretary of HHS to create the Center for Tobacco Products (the "CTP"), a new agency within FDA responsible for implementation of the Act.  *See* § 901(e) (codified at 21 U.S.C. § 387a(e)); SMF ¶ 3.  The Act further directed the Secretary to create the Tobacco Products Scientific Advisory Committee ("TPSAC"), which was charged with "provid[ing] advice, information, and recommendations to the Secretary" regarding various matters related to implementation of the Act.  *See* § 917(a), (c) (codified at 21 U.S.C. § 387q(c)); SMF ¶ 4.

The Act included two mechanisms for mandatory disclosure of documents and information by tobacco manufacturers that are relevant to this motion.

First, § 904(a)(1) required manufacturers to submit brand-specific recipe information for all cigarettes and other tobacco products currently on the market as of six months after the Act's enactment.  *See id.* (codified at 21 U.S.C. § 387d(a)(1)); SMF ¶ 5.  Specifically, the Act provided that "[e]ach tobacco manufacturer or importer, or agents thereof, shall submit to the Secretary [of HHS] a listing of all ingredients, including tobacco, compounds, and additives that are, as of such date, added by the manufacturer to the tobacco, paper, filter, or other part of each tobacco product by brand and by quantity in each brand and subbrand."  *Id.*; SMF ¶ 5.[3]  In guidance interpreting this provision, CTP explained that manufacturers were required "to specify whether an ingredient is added to the tobacco, to the paper, to the filter, or to another part of the tobacco product."  Center for Tobacco Products, *Guidance for Industry:  Listing of Ingredients in*

---

[2]    The Act was passed as Pub. L. No. 111-31, 123 Stat. 1776 (2009) and its operative portions were codified at 21 U.S.C. §§ 387, et seq.  *See SMF* ¶ 2.  This memorandum provides parallel citations to the Act and its codification.

[3]    The Act further required manufacturers to provide "all documents developed after [December 22, 2009] that relate to health, toxicology, behavioral or physiologic effects of current or future tobacco products, their constituents (including smoke constituents), ingredients, compounds, and additives."  § 904(a)(4) (codified at 21 U.S.C. § 387d(a)(4)); SMF ¶ 6.

*Tobacco Products*, at 9 (Nov. 2009); SMF ¶ 7.  CTP further established a uniform unit of measurement for manufacturers to use when complying with the mandate that they "must report the ingredients by quantity by brand and subbrand."  *Id.*

Second, § 904(b) gave FDA the authority to require manufacturers to produce certain documents:  "At the request of the Secretary, each tobacco product manufacturer or importer of tobacco products, or agents thereof, shall submit" "any and all documents (including underlying scientific information relating to [three specific areas concerning smoking and health]."  § 904(b)(1)-(3) (codified at 21 U.S.C. § 387d(b)(1-3)); SMF ¶ 8.

In recognition of the commercial value and confidential nature of much of the information that manufacturers may submit to CTP, the Act provided that submissions otherwise qualifying for protection as trade secrets or confidential commercial information under FOIA "shall be considered confidential" and "shall not be disclosed."  *See* § 906(c) (codified at 21 U.S.C. § 387f(c)); SMF ¶ 9.

Finally, the Act included a provision specific to menthol cigarettes relevant to this motion.  Section 907(e) directed the Secretary to refer to TPSAC "for report and recommendation . . . the issue of the impact of the use of menthol in cigarettes on the public health."  *Id.* (codified at 21 U.S.C. § 387g(e)(1)); SMF ¶ 10.

**B.      Defendants' § 904(a)(1) Submissions**

In June 2010, each of the Defendants made their § 904(a)(1) submissions to CTP.  SMF ¶¶ 11, 12; Declaration of James Swauger ¶ 10 (Ex. 1); Declaration of James E. Dillard ¶ 3 (Ex. 2) Those submissions included the quantities of menthol that Defendants used in manufacturing each of their brands and subbrands of cigarettes that were on the market at the time.  SMF ¶ 13.

## C. FDA 05-2010 Menthol Request And Defendants' Response

On May 26, 2010, FDA sent letters to Defendants requesting that they produce various documents and information relating to Defendants' menthol cigarettes that would "support the work of TPSAC" in making its report and recommendation pursuant to § 907(e). *See* SMF ¶ 14. FDA denominated its request as the "FDA 05-2010 Menthol Request." *Id.* at § II; SMF ¶ 15. That Request asked Defendants to respond to requests for documents and information relating to sixteen topics, and divided those requests into two broad categories based on whether compliance was mandatory or voluntary. *Id.* at § I; SMF ¶¶ 16-17.

FDA used its authority under § 904(b) to require Defendants to submit documents falling within ten topics. *Id.* at § I.A; SMF ¶ 16. FDA separately requested Defendants voluntarily to produce documents and information relating to six other topics. In the section of the letter titled "Additional Requests," FDA wrote that "[t]o provide additional background for the TPSAC review -- beyond the section 904(b) request -- CTP also asks that you submit the following information" covered by topics eleven through sixteen. *Id.* at § I.B; SMF ¶ 17. Topic 11 is relevant here:

> 11. Quantities of menthol . . . in the cigarette by brand/subbrand and by year between 2000 and 2010. Each brand/subbrand should be identified as a menthol or nonmenthol product [; and]

*Id.*

FDA 05-2010 Menthol Request further provided that, "[c]onsistent with applicable statutes and regulations, the confidentiality of trade secret and confidential commercial information submitted to FDA pursuant to this request will be preserved." *Id.* at § II; SMF ¶ 18.

On August 25, 2010, PM USA responded to the FDA's Menthol Request. SMF ¶ 19. PM USA's response included an encrypted computer hard drive with "a folder that contains information related to menthol that is responsive to items 11-16." SMF ¶ 20. Among other

6

information, PM USA provided CTP with available information on the amount of menthol in the manufactured product of its brands and subbrands from 2000 to 2010.  SMF ¶ 21.

On August 26, 2010 and October 6, 2010, RJRT and SFNTC responded to CTP's § 904(b) requests included in FDA 05-2010 Menthol Request.  SMF ¶ 22.

### D.  Section 904(e)'s Requirements Regarding Harmful And Potentially Harmful Constituents

Section 904(e) of the Act requires FDA to "establish, and periodically revise as appropriate, a list of harmful and potentially harmful constituents, including smoke constituents, to health in each tobacco product by brand and by quantity in each brand and subbrand."  *Id.* (codified at 21 U.S.C. § 387d(a)(3)); SMF ¶ 24.

On August 22, 2011, the FDA published a notice in the Federal Register that tentatively stated the criteria that it intended to apply to determine whether a constituent was an HPHC, listed numerous constituents that would fulfill those criteria, and requested public comment. 76 Fed. Reg. 50226; SMF ¶ 25.  Menthol did not appear on the tentative list of HPHCs.  *See id.* at 50229-30; SMF ¶ 26.

On April 3, 2012, FDA established the list of HPHCs and published it in the Federal Register.  *See* 77 Fed. Reg. 20034; SMF ¶ 27.  The list included 93 constituents, but did not include menthol.  *Id.* at 20036-37; SMF ¶ 28.

### E.  Plaintiff's FOIA Request And Federal Suit

On September 19, 2013, Plaintiff filed a FOIA request with FDA seeking "the published list . . . in regards to section 904(b) of the 2009 Family Smoking Prevention and Tobacco Control Act" concerning "the quantities of menthol in each cigarette by brand/sub-brand for all cigarettes from 2000 to 2010 that tobacco manufacturers were supposed to have made by December 22, 2009."  SMF ¶ 29.

On October 18, 2013, FDA denied Plaintiff's request on the ground that it sought trade secret and confidential commercial information that were exempt from disclosure. SMF ¶ 30; *see* 5 U.S.C. § 552(b)(4).

On October 29, 2013, Plaintiff appealed the FDA's denial to HHS. SMF ¶ 31.

On March 11, 2014, HHS affirmed FDA's initial decision, finding that "the quantities of menthol in each cigarette by brand/sub-brand are clearly trade secret." SMF ¶ 32.

Plaintiff thereafter filed this suit against HHS and FDA seeking an order that the information he seeks is subject to disclosure under FOIA. *See* Compl. ¶¶ 1-15 [Doc. 1]. This Court granted Defendants' motions to intervene. *See* Aug. 12, 2014 Text Order [Doc. 34] (granting Reynolds' and Santa Fe's motion to intervene); July 31, 2014 Text Order [Doc. 22] (granting PM USA's motion to intervene).

## LEGAL STANDARD

Summary judgment is appropriate "if the moving party proves that no substantial material facts are in dispute and that the movant is entitled to judgment as a matter of law." *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 561 (S.D.N.Y. 1989). To meet this burden in the FOIA context, the moving party must submit declarations or affidavits demonstrating that "each document [falling] within the class requested either has been produced, is unidentifiable, or is wholly exempt from the FOIA's inspection requirements." *Id.* (quoting *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982)). These affidavits are accorded "a presumption of good faith," and cannot be overcome by a plaintiff's conclusory allegations. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (internal quotation marks and citation omitted).

Once the moving party has made this threshold showing, "the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or

declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." *Id.* at 812 (internal citation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (internal quotation marks and citation omitted).

## ARGUMENT

FOIA cases are regularly and appropriately disposed of on summary judgment. *See*, *e.g.*, *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 229 (D.D.C. 2013); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 811 F. Supp. 2d 713, 732 (S.D.N.Y. 2011); *Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 270 (S.D.N.Y. 2012) (characterizing summary judgment as "the preferred vehicle for resolving FOIA cases." (internal quotation marks and citation omitted)). This case is no different, as it is clear that Defendants are entitled to summary judgment in their favor.

**I.      THE DOCUMENTS PLAINTIFF SEEKS REFLECTING THE QUANTITIES OF MENTHOL THAT DEFENDANTS USE IN MANUFACTURING THEIR PRODUCTS ARE EXEMPT FROM DISCLOSURE**

Documents that reveal the quantities of menthol that Defendants use to manufacture their cigarettes -- including any documents reflecting the information that Defendants submitted pursuant to § 904(a) -- are exempt from disclosure under FOIA because they contain trade secret and confidential commercial information. *See* 5 U.S.C. § 552(b)(4) (exempting "trade secrets and commercial or financial information obtained from a person and privileged or confidential").

**A.** **The Amounts Of Menthol That Defendants Use To Manufacture Their Cigarettes Constitute Trade Secrets**

Under FOIA and the Trade Secrets Act, FDA must withhold from disclosure any document which contains "trade secrets." 5 U.S.C. § 552(b)(4).[4] In the FOIA context, a "trade secret" is defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983); *see also* 21 C.F.R. § 20.61(a) (FDA adopting *Public Citizen*'s definition of "trade secret" in its internal regulations). This definition necessarily contemplates a relationship between the trade secret and the manufacturing process. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 151 (D.C. Cir. 2001). If the court determines that a document was properly withheld as a trade secret, "no further inquiry is necessary," and the defendant is entitled to judgment as a matter of law. *Public Citizen*, 704 F.2d at 1286.

To illustrate the proprietary nature of this information, Defendants submit the attached declarations of Richard Jupe ("Jupe Decl." (Ex. 3)), Vice President of Product Design & Development in the Research, Development & Engineering Department for Altria Client Services Inc. ("ALCS")[5] and James Swauger, Vice President, Regulatory Oversight for RAI Services Company ("RAIS") (Ex. 1).[6]

---

[4] FOIA's Exemption 4 is "co-extensive" with the Trade Secrets Act, 18 U.S.C. § 1905, "which prohibits federal government employees from disclosing confidential information." *Gen. Elec. Co. v. Dep't of Air Force*, 648 F. Supp. 2d 95, 101 (D.D.C. 2009). "Accordingly, when a person can show that information falls within Exemption 4, then the government is precluded from releasing it under the Trade Secrets Act." *Id.*; *see also Acumenics Research & Tech. v. U.S. Dep't of Justice*, 843 F.2d 800, 806-07 (4th Cir. 1988) ("[F]or information falling within exemption (4), the Trade Secrets Act does bar an agency decision to release the information.").

[5] ALCS is a separate, wholly-owned subsidiary of Altria Group, Inc., as is PM USA. ALCS provides a range of professional services and additional support to the parent company and each

Footnote continued on next page

Mr. Jupe and Mr. Swauger are familiar with Defendants' obligations under the Tobacco Act and the confidential nature of its submissions to FDA. Jupe Decl. at ¶¶ 2-3; Swauger Decl. at ¶ 3. Mr. Jupe and Mr. Swauger are also familiar with the ingredients in Defendants' cigarettes, the formulae by which these ingredients are combined, and the processes by which cigarettes are manufactured. Jupe Decl. at ¶ 3; Swauger Decl. at ¶ 4.

As Mr. Jupe makes clear, the quantities of menthol PM USA uses to manufacture its menthol variety cigarettes are so proprietary and competitively sensitive that PM USA maintains such information internally as "Ultra Trade Secret Information." *Id.* at ¶¶ 5-6; SMF ¶ 34. Similarly, RJRT and SFNTC maintain such information internally as "Highly Confidential Trade Secret Information." Swauger Decl. at ¶ 22; SMF ¶ 35. This information plainly qualifies as "trade secrets" under FOIA.

*First*, the precise quantity of menthol that Defendants use to manufacture each of their menthol brand cigarettes is a "secret" within the meaning of Exemption 4. To evaluate the applicability of the trade secret exemption, it is critical to distinguish between the amount of menthol contained in the manufactured product (*i.e.*, the menthol content of a cigarette sold at a store), and the amount of menthol used to manufacture a cigarette in the first instance (*i.e.*, a critical component of the brand's proprietary recipe). Jupe Decl. at ¶¶ 17-18; SMF ¶ 36. While it is possible to ascertain the former through costly inspection and analysis, *see infra* at 19-20, the manufacturing specifications of a particular cigarette brand (including the amount of menthol

---

Footnote continued from previous page
of the operating companies (including PM USA) pursuant to specific contracts or agreements. Jupe Decl. at ¶ 1 n.1.

[6] RAIS bears primary responsibility for coordinating the implementation of the Family Smoking Prevention and Tobacco Control Act (the "Tobacco Control Act" or the "Act") for Reynolds American Inc.'s tobacco companies regulated by the United States Food and Drug Administration ("FDA"), namely R.J. Reynolds Tobacco Company ("RJRT"), American Snuff Company, and Santa Fe Natural Tobacco Company, Inc. ("SFNTC"). Swauger Decl. ¶ 2.

11

used in the manufacturing process) cannot be reverse engineered. *Id.*; Swauger Decl. at ¶ 29. Accordingly, the application rate, location, and amount of menthol in Defendants' cigarette brands has never been disclosed to the public or to Defendants' competitors, and remains among Defendants' most closely guarded trade secrets. Jupe Decl. at ¶ 14; Swauger Decl. at ¶¶ 28-29; SMF ¶ 39.

*Second*, as the defining ingredient of Defendants' menthol brand cigarettes, the amounts of menthol used during the manufacturing processes are more than just "commercially valuable"; they are critical to each brand's proprietary recipe. Jupe Decl. at ¶¶ 15, 21; Swauger Decl. at ¶ 16; SMF ¶ 41. The quantity of menthol Defendants add to their products "contributes substantially to their unique taste, flavor, and aroma, which are all factors that affect adult smokers' choice of Defendants' brands." Jupe Decl. at ¶ 15; *see also* Swauger Decl. at ¶ 21; SMF ¶ 42. Moreover, "the inclusion (or exclusion) of small quantities of menthol can markedly change the taste, flavor or aroma of a cigarette." Jupe Decl. at ¶ 15; SMF ¶ 43. Accordingly, "[s]uch information is extremely valuable to Defendants and would be extremely valuable to any competitor or counterfeiter." *Id.*; *see also* Swauger Decl. at ¶ 21; SMF ¶ 44.

*Third*, while the cigarette manufacturing "process" and brand "formula" are composed of more than a single ingredient, menthol is critical to the taste profile of Defendants' menthol brand cigarettes. Jupe Decl. at ¶ 15; Swauger Decl. ¶ 35; SMF ¶ 45. Given the distinct market for menthol variety cigarettes, it is unsurprising that the amount, location, and application rate of menthol "are among the most important information in the process of making a menthol cigarette." Jupe Decl. at ¶ 15; SMF ¶ 46. Indeed, "[d]isclosure of [formulae and design specification] information, either collectively *or as to an individual flavor or flavor system*,

would give a competitor valuable information toward recreating and/or competing with that product." Jupe Decl. at ¶ 14 (emphasis added); Swauger Decl. ¶ 35; SMF ¶ 47.

*Finally*, Defendants' formulae and ingredient information (including the amount of menthol in its menthol variety cigarettes) reflect "decades of research and development efforts and an immense financial investment." Jupe Decl. at ¶ 16; SMF ¶ 48. Over the last century, PM USA has invested "many millions of dollars" developing, testing, and perfecting its various brand cigarettes. *Id.*; SMF ¶ 49. "That investment is ongoing." *Id.*; SMF ¶ 51. Similarly, RJRT and SFNTC have devoted decades to research and development and a significant financial investment in their formulae and ingredient information (including the amount of menthol in their menthol variety cigarettes). Swauger Decl. at ¶¶ 32-33; SMF ¶ 50.

In recognition of this substantial effort and investment, PM USA has historically gone, and continues to go, to great lengths to protect the confidentiality of their Ultra Trade Secret information. SMF ¶ 52. For PM USA, these measures include, but are not limited to:

(a) implementing extensive written security policies for ingredient and formula information and segregating this information from other records, *id.* at ¶¶ 8-9;

(b) dividing responsibility for ultra trade secret information among distinct working groups and limiting access to only those with a need to know, *id.* at ¶¶ 9-10; and

(d) ensuring compliance by allowing access to data stored electronically only after a two-factor authentication, consisting of an individual's user identification and a token password code that rotates every 60 seconds, *id.* at ¶ 9.

SMF ¶¶ 53-55. The same is true for RJRT's and SFNTC's treatment of its highly confidential trade secret information. Swauger Decl. at ¶¶ 24-26; SMF ¶ 56. RJRT's and SFNTC's information is strictly controlled in a secure office suite, with access to such information restricted to a limited group of persons that have agreed to comply with RJRT's and SFNTC's confidentiality and security obligations. Swauger Decl. at ¶ 24; SMF ¶ 56. The formulae

information stored electronically is also restricted to a limited group of persons that have agreed to comply with RJRT's and SFNTC's confidentiality and security obligations and can only be accessed with a secure password.  Swauger Decl. at ¶ 25; SMF ¶ 56.

Federal courts across the country have recognized that documents submitted to a federal agency revealing a product's manufacturing specifications meet the definition of "trade secret" under FOIA.  *See, e.g.*, *Herrick v. Garvey*, 298 F.3d 1184 (10th Cir. 2002) (affirming the district court's application of the trade secret exemption to aircraft plans and specifications); *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161 (3d Cir. 1982) (affirming the district court's finding that there was sufficient evidence that manufacturer would prevail in proving that drawings and written specifications for jet engine were protected trade secrets); *Appleton v. FDA*, 451 F. Supp. 2d 129, 141 (D.D.C. 2006) (documents revealing "drug product manufacturing information, including manufacturing processes or drug chemical composition and specifications" are trade secrets exempt from disclosure); *Citizens Comm'n on Human Rights v. FDA*, 1993 WL 1610471, at *7 (C.D. Cal. May 10, 1993) ("[I]nformation about how a pioneer drug product is formulated, chemically composed, manufactured, and quality controlled" is protected as trade secret), *aff'd in part & remanded in part on other grounds*, 45 F.3d 1325 (9th Cir.1995).  This Court should rule likewise here, and grant Defendants summary judgment.

**B.  The Amounts Of Menthol Defendants Use To Manufacture Their Cigarettes Constitute Confidential Commercial Information**

Exemption 4 extends beyond trade secrets also to protect "confidential commercial information" from disclosure.  § 552(b)(4); *see Public Citizen*, 704 F.2d at 1290 ("That the requested documents do not contain trade secrets does not mean that they are ineligible for protection under FOIA Exemption 4.").  The Second Circuit has held that "'Exemption Four applies if a tripartite test is satisfied:  (1) The information for which exemption is sought must

be . . . commercial or financial in character; (2) it must be obtained from a person; and (3) it must be privileged or confidential.'" *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (emphasis removed) (quoting *Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996)). Each of these requirements is easily met here.

### 1. The Information Is "Commercial"

There can be little dispute that this information is "commercial" within the meaning of § 552(b)(4) because it directly involves products that Defendants manufactured and placed into commerce. *See Public Citizen*, 704 F.2d at 1290 ("[T]he terms 'commercial' and 'financial' in the exemption should be given their ordinary meanings."); *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (broadly defining "commercial" in the FOIA context as "pertaining or relating to or dealing with commerce.").

### 2. Each Defendant Is A "Person"

It is equally clear that each Defendant is a "person," as that term is defined under FOIA. 5 U.S.C. § 551(2) (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency"); *see also FCC v. AT&T Inc.*, 131 S. Ct. 1177, 1185 (2011) (Exemption 4 "clearly applies to corporations," as "we far more readily think of corporations as having 'privileged or confidential' documents than personally private ones."); *Nadler*, 92 F.3d at 95 (same); *Bloomberg*, 601 F.3d at 148 (same).

### 3. The Information Is "Confidential"

The Second Circuit has adopted the test formulated by the District of Columbia Circuit to determine whether information is "confidential" for purposes of Exemption 4. *Nadler*, 92 F.3d at 95. For information to be confidential it must have the effect either "(1) of impairing the government's ability to obtain information - necessary information - in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information

15

was obtained." *Id.* at 96 (internal quotation marks and citation omitted). The information here squarely falls within the second category of protected information.

As discussed above, *see supra* pp. 13, PM USA's formulae information is "the end result of decades of innovation and millions of dollars." Jupe Decl. at ¶ 5; SMF ¶ 57. Accordingly, its commercial value to PM USA is "incalculable." Jupe Decl. at ¶ 7; SMF ¶ 58. Conversely, the same information "would be immensely valuable" in the hands of a competitor or cigarette counterfeiter, who could use it to create a new menthol cigarette that smokes and tastes like one of PM USA's brands. *Id.* at ¶¶ 17-18; SMF ¶ 59. Similarly, RJRT's and SFNTC's formula information represents the Companies' significant investment in research and innovation. Swauger Decl. ¶¶ 32-33; SMF ¶ 60. The commercial value of this information to both RJRT and SFNTC is inestimable. Swauger Decl. at ¶ 34; SMF ¶ 61. In the hands of a competitor or cigarette counterfeiter, the impact on RJRT and SFNTC would be devastating and result in substantial competitive harm. *Id.* at ¶¶ 35-37; SMF ¶ 62.

It is for this reason that Defendants employ extraordinary measures to maintain the absolute secrecy of all formulae information, *supra* at pp. 13, including through its participation in lawsuits such as the instant one.

Moreover, as a declining market, "[c]ompetition in the domestic cigarette market is fierce." Jupe Decl. at ¶ 19; *see also* Swauger Decl. at ¶ 36; SMF ¶ 64. Accordingly, "shifts of a percentage point in market share, or even a fraction of a percentage point, represent a very substantial amount of gross income." Jupe Decl. at ¶ 22; *see also* Swauger Decl. at ¶ 36; SMF ¶ 65. This reality applies with equal force to the menthol market, which currently accounts for 33% of all cigarette sales. Jupe Decl. at ¶ 22; *see also* Swauger Decl. at ¶ 36; SMF ¶ 66. "As menthol is the key distinguishing ingredient for PM USA, RJRT, SFNT's menthol flavored

cigarettes, the disclosure of the precise amount of menthol for any given brand or sub-brand would cause substantial harm" to PM USA, RJRT, and SFNT's businesses. Jupe Decl. at ¶ 21; *see also* Swauger Decl. at ¶ 36; SMF ¶ 67. This threat could materialize in one of two ways.

*First*, a domestic competitor could introduce a new menthol cigarette brand that more accurately mimics the taste profile of any of Defendants' brands. *See* Jupe Decl. at ¶ 19-22; Swauger Decl. at ¶ 31; SMF ¶ 68. In light of the strict prohibition on cigarette advertising and marketing, taste profile and price are two primary driving forces behind the domestic cigarette market. Jupe Decl. at ¶ 20; SMF ¶ 69. The ability of a competitor to introduce a menthol cigarette that smokes and tastes like a Defendants' brand would be "immensely valuable and, combined with factors such as price, would allow a company to increase its market share at the expense of other competitors." Jupe Decl. at ¶ 20; *see also* Swauger Decl. at ¶¶ 36-37; SMF ¶ 70. If such activity cost Defendants even a fraction of its market share, Defendants would lose "a very substantial amount of gross income." Jupe Decl. at ¶ 22; *see also* Swauger Decl. at ¶ 36; SMF ¶¶ 71-72.

*Second*, cigarette counterfeiters could use the information to more accurately recreate the taste profile of Defendants' menthol variety cigarettes; an inevitability that "would be highly damaging" to PM USA's, RJRT's, and SFNTC's businesses. Jupe Decl. at ¶ 23; Swauger Decl. at ¶ 35; SMF ¶ 73. Counterfeiters have already made great strides in recreating the look and feel of Defendants' products. Jupe Decl. at ¶ 23; SMF ¶ 74. For example, "when PM USA removed descriptors from its packaging in accordance with FDA regulation, counterfeit versions appeared in the United States less than four months after the new packaging entered the market." Jupe Decl. at ¶ 23; SMF ¶ 75. If the amounts of menthol Defendants use to manufacture each of their brands and sub-brands become public knowledge, the damage to Defendants would be twofold:

17

(1) a substantial loss in gross income, and (2) a serious infringement threat diminishing the value of Defendants' trademarks. Jupe Decl. at ¶ 23; SMF ¶ 76. While Defendants need only show a *likelihood* of substantial harm to meet the second prong of the confidentiality test, *Public Citizen*, 704 F.2d at 1291, the damage disclosure would cause here is a virtual certainty, as Plaintiff's avowed intent in seeking the information is to publish it as part of an academic paper.

Plaintiff may argue that Defendants' menthol quantities for 2000-2010 are "stale" and thus no longer commercially valuable. Such an assertion would be meritless. Defendants strive to maintain brand consistency over time, and occasionally re-brand or re-introduce older products. Jupe Decl. at ¶ 12; SMF ¶ 77. Accordingly, "[e]ven the amount of menthol used to manufacture a brand of PM USA cigarettes from five or ten years ago would reveal valuable information that would aid a competitor or counterfeiter in replicating how that cigarette tasted and would therefore be incredibly valuable to that competitor or counterfeiter." *Id.*; *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 16 (D.D.C. 2000) ("Information does not become stale merely because it is old," especially where it represents "years of research and development and enormous financial investment" and disclosure "would allow a competitor to determine the direction of the company's past and current efforts in research and development (and thus beat them to new advancements), and would give competitors an edge in improving their own technology.").

Nor can Plaintiff escape summary judgment by establishing that Defendants' formulae information can be reverse engineered. As discussed above, *supra* at pp. 11-12, it is impossible for competitors to determine the amounts of menthol Defendants use to manufacture their cigarettes because "menthol volatilizes (or evaporates) during the manufacturing process and disperses within the cigarette package." Jupe Decl. at ¶ 18; SMF ¶ 78. Thus, while the mere

possibility that a product could be reverse engineered is not sufficient to overcome protection of information from disclosure, *see infra* at 19-20, the amount of menthol used to manufacture Defendants' products cannot be reverse engineered in the first place. *Id.*; Swauger Decl. at ¶ 29; SMF ¶ 79.

## II. DOCUMENTS THAT PLAINTIFF SEEKS REGARDING THE AMOUNTS OF MENTHOL IN PM USA'S MANUFACTURED PRODUCTS ARE EXEMPT FROM DISCLOSURE

Documents that reveal the amount of menthol in PM USA's manufactured products -- including any documents reflecting the information that PM USA submitted pursuant to FDA's 05-2010 Menthol Request -- are exempt from disclosure for the independent reasons that (1) the information constitutes confidential commercial information; and (2) PM USA voluntarily produced the information and do not otherwise make it public.[7]

### A. The Information Constitutes Confidential Commercial Information

A similar analysis applies as performed *supra* in Part I.B. Again, the information is plainly "commercial" because it relates to characteristics of the products that Defendants place into commerce. *See Public Citizen*, 704 F.2d at 1290; *Am. Airlines, Inc.*, 588 F.2d at 870. And the information is "confidential" because its public disclosure would result in substantial competitive injury to Defendants. *See* SMF ¶¶ 57-68.

Plaintiff may argue that this information is not confidential because it can be measured by third-party purchasers of the manufactured product (*i.e.*, reverse engineered). But the assertion that the information loses its protection because it can be ascertained through a costly inspection of a manufactured product is "simply wrong," and akin to arguing "that the maker of a computer microchip, by putting the computer on the market, has therefore disclosed the microchip's

---

[7] Given that Defendants RJRT and SFNTC have no responsive documents in this category, the arguments made in this section are applicable solely to Defendant PM USA.

configuration because any person can open up the computer and examine the microchip." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 15 (D.D.C. 2000). Where reverse engineering is costly, the information continues to be protected confidential commercial information. *See Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981) (noting that if reverse engineering is only possible at considerable cost and effort, "agency disclosure may well benefit the competitors at the expense of the submitter."); *Greenberg v. FDA*, 803 F.2d 1213, 1218 (D.C. Cir. 1986) ("[W]hen the requested information is available at some cost from an additional source, the court must analyze '(1) the *commercial value* of the requested information, and (2) the *cost of acquiring* the information through other means.'" (citation omitted)). Likewise, where reverse-engineering would not provide information of the same quality, the information continues to be protected. *See Williams*, 681 F.2d at 163-64 (placing limited weight on evidence that Plaintiff was able to reverse-engineer manufacturer's product, where that reverse-engineering may not have been as precise as the information the manufacturer provided to the Department of the Navy). Here, measurements of the quantities of menthol in Defendants' manufactured products from 2000-2010 would costs hundreds of thousands of dollars, if it could be accomplished at all given that some of the products from prior years are no longer commercially available in the same form. Jupe Decl. at ¶ 25; Swauger Decl. at ¶ 29; SMF ¶ 80. Thus, the theoretical ability to reverse-engineer this information does not aide Plaintiff.

> **B.      Information that PM USA Voluntarily Provided Is Categorically Protected**

Courts have repeatedly made clear that non-public information that companies voluntarily submit to federal agencies is entitled to exemption from disclosure. In the seminal case on voluntary disclosure, *Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992), the D.C. Circuit held that voluntarily submitted information is categorically protected

under Exemption 4, provided it is not customarily disclosed to the public.  *Id.* at 878 (emphasis added).  As the court explained, providing heightened protection for voluntarily produced information furthers the important interest in "encouraging cooperation with the Government by persons having information useful to officials.'"  *Id.* (quoting *National Parks*, 498 F.2d 765, 768 (D.C. Cir. 1974)); *see also Center for Auto Safety v. National Hwy. Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001) ("*Critical Mass* emphasizes our concern with an agency's 'continuing ability to secure . . . data on a cooperative basis.'") (internal citation omitted).  The court further reasoned that "[u]nless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials[,], and the ability of the Government to make intelligent well informed decisions will be impaired." *Critical Mass*, 975 F.2d at 878 (citation omitted).  Moreover, the candor of submissions by parties with information useful to the government may be imperiled by a rule allowing for the production of information not customary disclosed.  *See id.*

District Courts in the Second Circuit have applied the *Critical Mass* test in analyzing whether voluntarily produced information should be disclosed under FOIA.  For example, in *Pentagen Technologies International Ltd. v. United States*, No. 98 Civ. 4831 (AGS) (THK), 2000 WL 347165 (S.D.N.Y. Mar. 31, 2000), the court rejected an attempt by the plaintiff to access voluntarily provided information not customary disclosed by the entity, applying *Critical Mass* and explaining as follows: "if the financial or commercial information was disclosed to the government voluntarily, it will be considered confidential for purposes of Exemption 4 if it is the kind of information that would customarily not be released to the public by the person from whom it was obtained."  *Id.*, at * 2 (quoting *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304-05 (D.C. Cir. 1999)); *see also Africa Fund v. Mosbacher*, No. 92 Civ. 289 (JFK), 1993 WL

183736, at *6 n.3 (S.D.N.Y. May 26, 1993) (citing *Critical Mass* with approval).[8] The same analysis should be applied here.

Both elements of the *Critical Mass* test are met here: (1) PM USA provided the information voluntarily; and (2) this information is of the kind that is not customarily disclosed to the public. 975 F.2d at 878. First, PM USA submitted the information in response to FDA's 05-2010 Menthol Request. The plain language of that Request made clear that FDA sought a voluntary disclosure: "To provide additional background information for the TPSAC review -- *beyond the [mandatory] section 904(b) request* -- CTP also ___asks___ that you submit the following information:

> 11. Quantities of menthol and nicotine in the cigarette by brand/subbrand and by year between 2000 and 2010. . . .

May 26, 2010 Letter § I(b).[9]

---

[8]   In *New York Public Interest Research Group v. E.P.A.*, 249 F. Supp. 2d 327 (S.D.N.Y. 2003), Judge Hellerstein declined to adopt *Critical Mass* -- but that was based on his finding that the *National Parks* test was flexible enough to allow for heightened protection of voluntarily submitted information without adopting a different test. *See id*. at 335. The court relied on the first prong of the *National Parks* test, "which examines the potential impairment on the government's ability to obtain necessary information in the future." *Id.* The court explained that, under this prong, voluntarily submitted information would naturally receive greater protection because the risk of impairment would be greater. *See id.* While Defendants believe that this Court should adopt *Critical Mass*, as discussed *infra* note 8, at 22, even applying the *National Parks* test as construed by Judge Hellerstein, this information is exempt from disclosure.

[9]   Plaintiff may contend that FDA had the authority to compel disclosure of this information. But under *Critical Mass* the potential existence of such unexercised authority is irrelevant:

> [W]e know of no provision in FOIA that obliges agencies to exercise their regulatory authority in a manner that will maximize the amount of information that will be made available to the public through that Act. Nor do we see any reason to interfere with [an agency's] exercise of its own discretion in determining how it can best secure the information it needs. So long as that information is provided voluntarily, and so long as it is of a kind that [the company] customarily withholds from the public, it must be treated as confidential.

975 F.2d at 878.

Nor can there be any reasonable dispute that the information Plaintiff seeks is not customarily disclosed to the public. As demonstrated by Mr. Jupe declaration, PM USA does not disclose the amount of menthol in their manufactured products to the public at anything approaching the level of detail and scope in its response to Topic 11 of FDA 05-2010 Menthol Request (*i.e.*, for brands and sub-brands across a period of more than a decade). Jupe Decl. at ¶¶ 5-18; SMF ¶ 82. Not only is this information not customarily disclosed to the public, but PM USA takes active steps to avoid such disclosure. Jupe Decl. at ¶¶ 7-11; SMF ¶ 82. Thus, under *Critical Mass*, this voluntarily submitted information is categorically protected.

## III. PLAINTIFF'S RELIANCE ON § 904(e) IS MISPLACED

Defendants suspect that Plaintiff will argue (as he did to FDA and HHS) that he is entitled to the requested information under § 904(e), which requires FDA to publish "a list of harmful and potentially harmful constituents ("HPHCs", including smoke constituents, to health in each tobacco product by brand and by quantity in each brand and subbrand." *Id.* (codified at 21 U.S.C. § 387d(a)(3)). But menthol is *not* and has never been on the FDA's list of HPHCs. 77 F.R. 20034, 20036-37. Plaintiff's belief (stated in his submission to FDA) that "menthol *should* be considered a harmful or potentially harmful constituent" is irrelevant to this suit. Congress tasked HHS, FDA, and CTP -- not Plaintiff -- with the responsibility of regulating tobacco products and determining which constituents constitute HPHCs. *See* Declaration of Sarah B. Kotler to the Government Defendants' Motion for Summary Judgment, Attachments 1 and 4. To the extent that Plaintiff wished to comment on the FDA's tentative list of HPHCs (which did not include menthol), he had an opportunity to do so after that list was published in the Federal Register. Plaintiff cannot challenge FDA's final determination as to the list of HPHCs in the context of a FOIA request, nor can he used FOIA to force FDA to create documents that otherwise do not exist. *Chrysler*, 441 U.S. at 292 (holding that FOIA is "exclusively" a

23

disclosure statute). Indeed, this Court would not have the power under FOIA to grant such relief. *Id.*; *see also* 5 U.S.C. § 552(a)(4)(B) (district court's jurisdiction under FOIA limited "to enjoin[ing] the agency from withholding agency records and to order[ing] the production of any agency records improperly withheld from the complainant."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165 (1803).

## CONCLUSION

For all of these reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

Dated: September 30, 2014                        Respectfully submitted,

                                                 HARRIS BEACH PLLC


                                                 By:  Richard T. Sullivan
                                                      Richard T. Sullivan
                                                      Larkin at Exchange
                                                      726 Exchange Street, Suite 1000
                                                      Buffalo, New York 14210
                                                      Telephone:  (716) 200-5114
                                                      Facsimile:  (716) 200-5215
                                                      Email:  rsullivan@harrisbeach.com

                                                      *Attorneys for Intervenor Philip Morris USA Inc. filing on behalf of R.J. Reynolds Tobacco Company and Santa Fe Natural Tobacco Company, Inc. for the purposes of this motion only)*


*Of counsel:*

Kristen E. Ittig
Email:  Kristen.Ittig@aporter.com
Geoffrey J. Michael
Email:  geoffrey.michael@aporter.com
ARNOLD & PORTER LLP
555 12th Street NW

Washington, DC 20004
Telephone: (202) 942-5000
Facsimile: (303) 942-5999

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 30, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record. In addition, I hereby certify that on September 30, 2014, I served Defendants' Notice of Motion for Summary Judgment, together with its attachments, on the following party by first-class mail: Kyle T. Rozema, 311 E. Green St. Apt. 6B, Ithaca, NY 14850.

*/s/ Joie A. Gill*
Joie A. Gill